Thank you. The first case we'll hear today is Williams v. Globus Medical, No. 16-3607. Thank you. May it please the Court, Jacob Goldberg on behalf of Austin Williams. I'll reserve five minutes. That's great. Considered in its context, the risk disclosure in this case itself, defendant's characterization of the risk of losing a significant distributor disabled investors from assessing that risk. There was another risk as well, was there not? There was a pricing problem that you don't deal with very much? There was, Your Honor. There was a pricing risk. They did mention it. They also said in their August 5th conference call that by instituting certain measures, they could mitigate that risk going forward. But it certainly was part of what they disclosed on August 5th. But, Your Honor, if I may, of the 33 questions in the colloquy during the August 5th call, 21 involved in some way the distributor issue. Well, just because that was of more interest to the folks who were on the call, does that have significance, really, in our analysis? It does, Your Honor. It absolutely does. Cases have shown that there's a Second Circuit case, the name of which is escaping right now, that analysts who discuss a particular issue, especially ones who express shock, as they did in this case, I guarantee you, I have been receiving calls, says the Bank of America analyst, and I guarantee you this is material. Why did you not disclose it? And the this he's talking about is not necessarily about the forecast. It's about losing the distributor. And again, Your Honor, as I stated in the beginning, putting context, this disclosure is critical. And it is because you'll recall that in 2010, analysts knew that the company had lost the L5 distributor. And it took the company two years to recoup that revenue. So analysts were paying attention to this disclosure. Of course, that was not the case here. The company ended up in quite good shape at the end of the year. Yes, Your Honor, as you know, the securities laws under the precedent of this court in Oren and every other court, including the Supreme Court in Matrix, measure the falsity, the actionability of a statement ex ante and not ex post. You'll recall also, Your Honor, that in an October conference call, this company says we have not yet recouped the Vortex revenue that we lost, despite our sales efforts. So whatever happened that propelled the company to only miss by, as Mr. Kaplan calculates, 1.7% at the end of the year, it had little, if anything, to do with recouping Vortex. So if we look at this ex ante, what do we see? We know that the defendants included in their forecast Vortex revenue. Having included that revenue, the question for us with respect... How do we know they included the Vortex revenue? That seems to be in dispute. Yes, Your Honor, but it really isn't. If you read the transcript of the August call, the reason they revised the forecast is they say we lost the revenue from a significant distributor. It cannot be, it can't be in dispute. How much may be in dispute, and we can talk about that, but it is not in dispute that Globus included in the forecast some Vortex revenue. We don't know how much, but it included some. And in the end, the reason for the revision was due in part, and we believe in large part, to the miss related to the Vortex revenue. Should you be required to plead with particularity the impact of Vortex's efforts and sales compared to the other efforts by other independent distributors or the in-house distributors? You didn't have any of that in your complaint. Right. So, Your Honor, not with respect to the risk disclosure. We can talk certainly about the forecast, but here's what happens with the risk disclosure. Starting in February, the company and the defendants discuss with the market what they believe the revenue will be for that year. Revenue is critical because margins are razor-thin in this business, because the products are sort of fungible. So revenue is an important, sales are an important focus. So they focus on sales, and they tell the market what they're going to make, and they say in their risk disclosures, generally, these are known material risks. So even if, Judge Sirica, the court finds that the forecast is not actionable for our failure to plead it, and we don't believe that, so as you know, even if you find that the forecast is not actionable, the question is, if they included Vortex revenue in that forecast, and they did, then the risk disclosure says some of our distributors contribute significantly to our revenue, a significant portion of our revenue. They themselves track that language during the August 5th call. They say, we lost a significant distributor. And the analysts, Judge Shigereth, the analysts are very critical of this. This is something they need to know, because again, contextually, this has happened before, and it took them two years to recoup. And again, Judge Sirica, in October, they have not yet recouped. So what you have is a revenue forecast with known material risks. Well, as Judge Sirica pointed out, we do have a pleading standard here. We don't know whether they built it in. According to your complaint, they knew the whole time they were going to be getting rid of Vortex. It seems like it's speculative whether they built this in. You seem to say they did not. No, no, Your Honor. I'm so sorry if I gave you that impression. They absolutely built it in. If they didn't build in Vortex revenue into the forecast, how then, why then, do they revise the forecast downward? Why do they disclose that to the market? If there's no Vortex revenue included, there's no disclosure necessary. There's no material revision downward. Well, this all happened toward mid-year when the relationship was severed, right? Certainly they realized some revenue during the year, right? We don't know, but if I may, can I take you back ex ante? Again, they may have recognized some revenue, but what they say in August is, we have taken a hit with respect to a significant distributor. That must mean that they put that revenue into the forecast, some revenue. Again, we don't specify. But let me tell you that it doesn't matter ex ante. And the reason it doesn't matter is because what the analysts are doing, as I started off by saying, this is a characterization of risk. And if you disclose risk, you are required to disclose if that risk has come to fruition in a material way. That's Westinghouse, that's Voigt v. Wonderware, that's the In re Home case. Well, what about Judge Sirica's excellent opinion in Pfizer? It kind of calls into question whether there's a duty to actually get, you know, do they even have a duty to say anything? Yes, they do, and here's how. Again, seen ex ante in conjunction with the forecast. What you have is a disclosure of a known risk, and that disclosure of the known risk is what the company said and confirmed. There are no material changes to our risk profile. Now, there was a material change because they had lost a distributor. So, Judge Chigueras, in colloquy that could have happened had they disclosed it, an analyst might have said, is this material? Who is the distributor? We're not going to tell you. They could have asked all questions that related to it and priced in the loss of that distributor. Again, in the context of knowing that two years earlier, or four years earlier, something bad had happened with the distributor, and it took the company two years to recover. If they had a duty to disclose, in which statement should have their disclosure been made? Sure. In the risk disclosures, in the risk disclosures, Judge Fischer. Which one, the March statement or the April statement? So, Judge Fischer, they incorporate these risk disclosures in their statements by reference in February, then they state the risk disclosures again in March, and then in April, in a press release, they state them before they have conference calls, and then they state them in a 10-Q, in which they say there are no material changes. But they said significant revenues. That's the risk, a loss of significant revenues. And in the end, they say they lost a significant distributor. When was the contract with Vortex terminated? Your Honor, it wasn't. What actually happened was they, Globus, presented a contract to Vortex, and Vortex rejected it. Well, it was terminated at the end of the year, and then it was extended for four additional months. It was, Your Honor, it was extended. And then there was a new contract, and so does it make a difference that the way, or the manner in which the contract was terminated? It doesn't, Your Honor. What they say in the risk disclosure is if someone ceases, what happened here is Vortex actually did cease. They ceased selling products. They took Dr. Steck, and as we allege in the complaint, they went to Medtronic. So when did that happen? That happened on April 18th, Your Honor. As the defendants concede in the colloquy, early in the second quarter, we lost this distributor. Did they know as of April 18th that they had moved the business elsewhere? That I do not know, Your Honor. But, again, what you are doing is moving this into what the forecast was instead of what the risk was. Once the distributor walked away from the contract that Globus offered, that risk became different than it was before Globus walked away. What date was that? That was April 18th. April 18th. Yes. So early in that second quarter, that's what happened. And the subject matter of the lawsuit between Globus and Vortex that's pending in the Eastern District of Pennsylvania, does that have anything to do with this case? It doesn't, Your Honor. That's a contract dispute among the two. It may have some elements of business tort as well. The Vortex folks accused Globus of having pilfered some of its confidential information. But I don't think that has to do with the risk disclosure ex ante. All right. Okay, thank you. Thank you. May it please the Court, Barry Kaplan of Wilson-Sonsini for all of the defendants at Pele's. What's really striking about this case is how much it's based completely on conjecture. If you start with the projections, the projections, the allegations of the projections are completely devoid of any factual allegations. There is nothing alleged in this complaint that said what went into those projections. And, in fact, the suggestion that there were Vortex revenues in those projections are completely contrary to the other allegations of the complaint, which this Court must accept is true for the purposes of this motion. Because what the allegations in the complaint are is that Globus decided that they were going to terminate Vortex because they really didn't like what Vortex was doing. And then they, according to the complaint, strung Vortex along until they were good and ready with a replacement team in place, and then they terminated Vortex. Now, it is inconsistent with that to suggest at that point then that Globus put into their projections Vortex obtained revenues as opposed to revenues that are obtained by this replacement team that they put into place. And, in fact, the real problem with the plea here is that there is really not a single factual allegation that says what did go into those projections. So, if Globus had intended and did intend to terminate the relationship with Vortex, how could they possibly have included Vortex's sales in the projections? I think that's right. According to the allegations of the complaint, Globus did not terminate Vortex until they were good and ready with a replacement. So, if they're projecting their revenues for the year, they would have included, it's logical, much more plausible that they would have included the revenues from the region, from Mississippi and Louisiana, but not from Vortex. That's the big missing link here. Plaintiff says it's clear as day that they must have included Vortex revenues. What's much more plausible is that they included revenues from the replacement team, and then that replacement team, unfortunately, did not perform as well as they had hoped. When your earlier statements had said that the loss of a distributor was a risk, and on April 18th you knew that Vortex had been terminated and, in fact, moved their business, whatever business they had, they were going to try to move elsewhere. Why wasn't that a fact that should have been disclosed in the April 10 queue? Yes, so there was no duty to disclose, Your Honor. In fact, there was no duty to disclose. Why not? If you look at the risk disclosure, and let's talk about what a risk disclosure is. A risk disclosure is informing investors of the risks that the business actually faces. The risk disclosure here, and I'm not going to quote the whole thing, but basically among many disclosures says the risk is if we are unable to maintain and expand our network of direct sales reps and independent distributors, and then says we face significant challenges and risks in managing our geographically dispersed distribution network and retaining the individuals who make up that network. This was all about the risk that we couldn't hold on to people. It seems like once you opened the door by disclosing that risk, that to not disclose the actual loss of the dealer when you knew it had taken place was a breach of that duty. Respectfully, I don't agree, Your Honor, because what this risk is we didn't open the door to saying that we have a risk that we might terminate for good and proper corporate reasons because it benefits the company, a distributor who is not performing the way we would like. This talks about the risk that we might lose distributors that we cannot, as it says. Well, isn't that what happened here? I mean, you end up, you said you terminated him, but you actually offered him a contract, just that it was a contract that you likely knew he wouldn't accept. So it wasn't you terminated him, he left. It fell within the risk that you had previously disclosed. Respectfully, I disagree, Your Honor. In fact, the reality is that what we were warning about were negative things to the business because we couldn't retain distributors or salespeople that we wanted to retain. That's the risk. This was a completely different situation. Does that warning appear in every one of your disclosures? Because that always can happen, right? I believe it does appear in all of our disclosures. I've only looked during the relevant class period, Your Honor, but I believe it does appear. And that continues to be a risk, frankly, into the future. It is a risk. If you are unable to retain distributors and salespeople who are important to your business. On the other hand, we were not warning about a risk that we might decide that we need to terminate a distributor, get rid of a distributor, however you want to characterize it, because that wasn't a risk to the business. It was actually something the business decided to do that was for the benefit of the business. Your Honor's theory relies on the Voight U.S. District Court case out of the Eastern District of Pennsylvania to support the argument that there was a duty to disclose the termination of Vortex. Did the district court get it wrong there? I think in the circumstances of this case, there was no duty to disclose because what did the company say? Certainly there's no affirmative duty to generally disclose, okay? It has to be based upon what you've said in the past. The company never said anything about Vortex until the day that it said we terminated Vortex. Until the day that they said we are reducing our projections down. And one of the reasons, of the two reasons they gave, is that they terminated Vortex. That's all they ever said. They did say affirmatively that we are in the process of transitioning from independent distributors to more employee distributors. In light of the fact that the risk disclosure is the only basis upon which plaintiff suggests that imposed a duty upon Globus to disclose the termination, and we believe this risk disclosure does not actually speak to that and create a duty to disclose. So in the circumstances of this case, we don't think it applies. By the way, what I'd like to do is also indicate, because we're talking about the, I started talking about the fact that this case is really based completely on conjecture. The only fact that plaintiff points to, to suggest that there were Vortex revenues in the projections, they don't point to confidential witnesses, they don't point to documents. They point to the fact that in August, when we reduced our projections downward, we said one of the reasons was pricing pressure on all of our products, and the other reason was because we terminated this distributor. Well, in light of the fact that they also alleged that we terminated the distributor when we were good and ready to replace it with our own team to take over these revenues, in fact the allegations here have been more specific, that we got as much information about this distributor as possible, and then we terminated the distributor when we were good and ready to take over. That in no way suggests, as plaintiff says, that it is clear that there were Vortex revenues in the projection. In fact, it suggests just the opposite, that the replacement team that we put into place when we terminated Vortex just didn't live up to the expectations that we had, and that it's not an actionable omission. I'll say further that with respect to the projection claim, that even in the event that the projection could be found to be properly alleged to have included Vortex revenues, which we don't think it can, this projection is still protected by the Safe Harbor for forward-looking statements under the Reform Act, because it was clearly forward-looking, and because it was accompanied by pages and pages of detailed, meaningful risk disclosures. There's clearly no requirement under the Reform Act and the Safe Harbor that you can identify the specific risk that ultimately made the projections not to come true. In any event, the forward-looking projection is covered by the Safe Harbor. I will also say that it is in the record that the plaintiff says that we ultimately missed this projection by 1.7%. In fact, the record says 1.17%, which is considerably less than that. But what we actually see here is an overly conservative reduction in the projection mid-year. Ultimately, at the end of the year, it turned out that that was overly conservative. Your friend tells us and points to cases that say it's really only an ex-ante view that you've got to look at, and what you're saying basically is not really relevant. I don't think that's the case. By the way, in fact, in this court, in a number of decisions, including Merck, which cites Scholastic and Burlington, this court has said that any information that sheds light on whether class period statements were false or misleading is relevant. Of course, the question here is simply the relevance, because we had entered this information into our motion to dismiss under judicial notice that was not objected to, and really the only issue here is the relevance. This court has said a number of times that any information that sheds light would be relevant. In fact, in the Avaya decision of this court, the court actually looked at the actual results of a particular quarter and found it to be relevant in determining whether or not the projections were false when made. To not look at how things ultimately turned out when it is not subject to dispute, I mean, it's similar to having the Wright brothers sued for saying that airplanes can fly, but refusing to look up and see the airplanes in the sky. I mean, this is exactly what happened. Well, I'm not so sure. I mean, look, if you were headed for a 5% growth and you had a 1%, I mean, you can see reasons why you shouldn't be looking forward, because it could have been better than everybody thought. Instead of a 1% loss, it could have been a 5% gain. You know, you can understand policy-wise why we look ex-ante. Yes, except what makes it relevant in this case is the basic theory of Plaintiff's case is this. You included vortex revenues even though you knew vortex was terminated. Therefore, you put out projections which you knew to be impossible to meet, unachievable. And then we show, in fact, not only did we meet them where we came within 1%, 1.17%, but we exceeded earnings per share. So basically, it undermines the entire theory of Plaintiff that we put in revenues which we knew didn't exist, and we therefore put out unachievable projections. Can I ask you a question? Oh, I'm sorry. I'm going to throw up on that. That was for the entire year, though, correct? Actually, the only projections involved in this case are for the entire year. For the entire year. The company never put out projections other than for the entire year. Even on a quarterly basis? Pardon? You weren't putting out projections on a quarterly basis. They did not. And it's kind of funny because, in a way, it's like no good deed goes unpunished here. In the middle of the year, the company said, we think we need to be a little bit more conservative because things aren't working out the way we are. So they reduced their guidance. Ultimately, it was too conservative, and they wound up basically doing the same thing and exceeding earnings per share, but it's only yearly revenues that have ever been forecast. Could you comment about Scienter a bit? Was that pled with the requisite particularity? I assume the argument is that they didn't reasonably believe that they could make up the loss of, if that's the right word, the loss of Vortex and other means. Give us your view on Scienter. Well, two things. First of all, with respect to a forward-looking statement under the Reform Act, Scienter is actually even a higher standard than we're used to with affirmative statements of historical facts. Scienter is actual knowledge of falsity. There are absolutely no allegations here which show actual knowledge of falsity. There is actual knowledge, we admit, actual knowledge that Vortex was terminated, but there's no actual knowledge alleged that we knew that these projections were incorrect or false, because, in fact, there's no facts alleged that show that the projections were false and included information that they shouldn't have included. With respect to the statement about just having to disclose generally that we've terminated Vortex, the risk warning, with respect to that aspect of the risk warning at which plaintiff says, well, that's just in and of itself a false statement, that requires Scienter under the securities laws. And, again, there's zero allegations, factual allegations, that show that there was Scienter. It's just not there. In fact, it's all based, again, upon this false idea that when we said that we had not done as well as we had hoped, that we therefore admitted that we had falsely put in revenues from Vortex, How could you say there was absolutely no Scienter when you knew that Vortex was terminated on April 18th and your April 10 Q was filed on April 30th? You had to know that that had happened. Yes. And you filed your 10 Q. Now, whether you had to disclose it might be another question, but you had to know that you didn't disclose it. The question, Your Honor, that was what you knew. Yes, we can acknowledge it. We knew that we terminated Vortex. That's not an issue. The question was that knowledge of something false. Is that knowledge that we had a false projection? There's no evidence of that. Is that knowledge that we said something false? There's no evidence of that. That we said, for example, that we said the risk factors were our fear of losing something, and, in fact, what we did was we terminated Vortex. So, yes, we knew that Vortex had been terminated, but that doesn't speak of knowledge of anything which shows false statements or falsity. Can I ask you a question? Your adversary started off with pointing out what the analyst said during the call and that they were very fixed on it and maybe the majority of the call had to do with Vortex. Does that have analytical significance for us, the fact that the analysts were more of a Your adversary seems to say yes. I don't think so. Look, analysts are quite properly concerned when negative developments in a company are disclosed. It raises the question of whether, by itself, the termination of Vortex or the loss of revenues in Mississippi and Louisiana would be material by itself, which the record doesn't establish. But also the fact that analysts are concerned says nothing about whether there was a duty to disclose earlier than the moment it was disclosed. The people, yes, they were unhappy about a negative turn in the business. Okay, thank you. Thank you. Could you pull the microphone up? Absolutely. So sorry, Judge Harris. This is dancing on the head of a pin. There is no fair reading of this complaint that says anything but that what we mean is that these were revenues they included in the forecast that had previously been attributable to Vortex but that were directly issued, put at risk because of the termination. These are revenues that were attributable. My colleague says we set up a replacement team. What? To do what? They set up a replacement team to capture the revenue that Vortex had. They knew that the products here are fungible. They knew that relationships with independent distributors were critical. They knew that doctors like Dr. Steck, the single largest prescriber of Globus products in the United States, followed their representatives, and, in fact, we plead that's what happened. There is simply no fair reading of this complaint that the revenue that Vortex had recorded for Globus in 2013 and what they projected would be increased or decreased from that, they included some portion of those revenues in their forecast. There's no question. And in October, they say that the replacement team they set up had failed. They were not recouping the revenue. This is Vortex revenue. So when we describe it as Vortex as shorthand, what we mean is that that revenue was attributable to Vortex customers, and that is what they lost, and that is why they were forced to revise their revenue projection. There is simply no fair reading of this complaint, none, that does not come to that conclusion, that they anticipated that they could recoup Dr. Steck and other doctors that Vortex had represented. That's what the team was put in place to do. That's what the team failed to do, and that's among the reasons they revised the forecast. It's simple. Judge Chigares, you mentioned the Voight case. Voight is instructive here. In a reorganization plan, the defendant said, we have a known material risk. If we lose one of our key employees, this reorganization might not go well. But they'd already lost a key employee. So relying on this court's opinion in Westinghouse, in which it discussed risk disclosures and said, if there are economic issues that may occur in the future, but they've already occurred, that's important to us. And citing the Rubenstein case from the Fifth Circuit, this court said, to warn is prudent. To warn when the risk has already come to fruition is deceit. You cannot deceive. Thus, once they disclose that risk in Voight, once they say, we have a risk if we lose our key personnel, they're required to tell you that they lost the key personnel, or else the risk is meaningless for purposes of the safe harbor, and it is in and of itself false. It is deceit. You mentioned Sienter. They have acknowledged, Judge Fisher, that they knew that Vortex had left. They knew it. You quite rightly point out, Judge Fisher, that the 10Q says there are no material changes to risk. I ask you to understand that even though they replaced the team, and they may have in good faith, we believe it was bad faith, and we believe we've pleaded it, but they may have believed that they could replace that revenue from the geographic region that Vortex represented. That even if they believed it, it was still a risk. And it's not just a general ethereal risk. They knew what happened in 2010, and the analysts knew what happened in 2010. They had lost L5, and it took them two years to recover. This is why they say this risk, that they plan to maintain these people. This has nothing to do with who terminates who. The analysts don't care. That's quite evident from the transcript. They don't say, well, did Vortex quit, or did this significant distributor quit? No. They simply say, you lied to us. This happened in the beginning of the quarter, and I'm getting phone calls from my investors and emails, and they're telling me, I guarantee you this is material. And Mr. Dembski, defendant Dembski responds, well, we did an analysis of that. That analysis would have to be ex ante. It couldn't be ex post. We did an analysis of that, and from a legal perspective, we didn't think it was. That's apples and oranges. The analyst is talking about the very fact of the departure of the distributor and the ramifications of that, and Mr. Dembski may be saying, well, we baked that into whatever forecast we did. Those are two different things. This case is about a risk disclosure that was deceitful. Thank you, counsel. Thank you. We thank counsel for their excellent arguments and briefing. If counsel is willing, we'd like to greet you at sidebar, if we could go off the record for a minute.